### No. 23,165.

CHARLES N. COLE, *Appellant,* v. HENRY DRUM et al., *Appellees.*

#### SYLLABUS BY THE COURT.

1. WITNESS—*Cross-examination—Certified Copy of Former Arrest and Conviction.* A witness on cross-examination was asked if he was not arrested on a certain occasion for assaulting his wife, and he answered "No," whereupon a certified copy of a journal entry of conviction was offered and rejected. *Held,* that while the court might in its discretion have permitted its introduction as a part of the cross-examination, its rejection was not error, as the cross-examining party still had the right to offer it as a part of his case in rebuttal, which was the proper time for its introduction.

2. WILL—*Action to Set Aside—Evidence.* Certain witnesses were precluded from stating that the testator could not talk connectedly; but as one of them had already so testified, and both were permitted to state that they regarded the testator as of unsound mind, no material error was committed.

3. SAME—*Action to Set Aside—Mental Incapacity—Evidence of Doctor—Conclusion of Witness.* A doctor who stated that he regarded the testator as of unsound mind was precluded from testifying whether a request for an overdose of morphine, or the fact that he talked of or made an attempt at suicide indicated insanity. *Held,* that as the conclusion sought was shown by this witness it was not materially prejudicial to exclude the indicated grounds of such conclusion.

4. SAME—*Evidence of Attorney Who Drew the Will.* The attorney who drew the will in controversy was permitted to testify whether or not in his opinion the testator had sufficient capacity at the time to make a valid will. He told of his long acquaintance with the testator and in detail of his conversation and directions at the time. While it was incompetent for him to state the conclusion asked for, inasmuch as the jury in this case acted only in an advisory capacity, their advice

being rejected by the court, who made extended findings, it must be presumed in accordance with the settled rule that the decision was influenced by competent evidence only, and hence, the admission of the statement must be deemed immaterial.

5. SAME—*Action to Set Aside—No Jury as Matter of Right.* Under the 5th section of the bill of rights and the decisions of this court during almost its entire history, the parties to this suit to set aside a will were not entitled to a trial by jury.

6. SAME—*Mental Capacity to Make a Will.* The settled rule in this state is that one who is able to understand what property he has and how he wants it to go at his death, is competent to make a will even though he may be feeble in mind and decrepit in body.

7. SAME—*Findings of Court Sustained.* The record fully bears out the conclusion reached by the trial court.

Appeal from Bourbon district court; EDWARD C. GATES, judge. Opinion filed May 7, 1921. Affirmed.

*J. I. Sheppard, James G. Sheppard,* and *A. M. Keene,* all of Fort Scott, for the appellant.

*B. Hudson, Douglas Hudson,* and *William P. Dillard,* all of Fort Scott, for the appellees.

The opinion of the court was delivered by

WEST, J.: This suit was brought by Charles N. Cole to set aside the will of his father, John N. Cole, on the ground of mental incapacity. The testator died August 24, 1918, at the age of seventy-six years. He had lived on his farm near Fort Scott for many years and was well known in the neighborhood and had many acquaintances in town. His wife died in July, 1916, and in February of the following year he had a stroke of paralysis, rendering useless his left leg and arm, and affecting one side of his face. Thereafter he was for a time at his son's home, and then for a while in the Soldier's Home at Leavenworth, and upon returning to his farm was cared for by a Mr. Bollinger and wife who were employed for that purpose. The son had remained at home until thirty-three years old, when he married and moved to his farm of 160 acres about two miles from the 680-acre farm of his father. His wife and his father did not get along well, and the latter believed she did not like him and might influence his son against him.

The will was made June 21, 1918, and was duly probated. This suit was begun November 16, 1918. A jury were called in and to them was submitted the question of the testator's mental capacity. Twenty-seven witnesses testified for the plaintiff and thirty-five for the defense. The case was skill-fully tried. The jury answered that the testator did not have testamentary capacity. The court set this aside and made thirty findings of fact, and as matters of law concluded that when the will was made John N. Cole possessed the requisite testamentary capacity, and that the will is valid. The plaintiff moved to set aside all these findings, and for a new trial, both of which motions were overruled. The plaintiff appeals and complains that the court erred in admitting and excluding evidence, in not submitting the case generally to the jury, and in denying a new trial.

A witness for the defendant was asked on cross-examination if he was not arrested on a certain day in an action in a justice court, for assaulting his wife, and pleaded guilty, and he answered "No," and thereupon the plaintiff offered in evidence a certified copy of the journal entry of such conviction, to which an objection was sustained. To the complaint that this was er-roneously excluded, counsel reply that had the certified copy been properly authenticated it should have been offered, if at all, as a part of the plaintiff's case and not as part of the cross-examination, and that it was not presented upon a motion for a new trial as required by section 307 of the civil code. Follow-ing *Treiber v. McCormack,* 90 Kan. 675, 136 Pac. 268, and *Bank v. Seaunier,* 104 Kan. 7, 178 Pac. 239, it is held that the certified copy was not necessary to be reproduced on the motion for new trial as the court had already had an opportunity to examine it. That the copy could not be introduced as a part of the cross-examination is indicated by *Williams v. Miller,* 6 Kan. App. 626, 49 Pac. 703.

"The proper foundation for impeachment of a witness by a written instrument having been laid, the proper time to offer the paper as im-peaching evidence is when the time of the party seeking to impeach the witness to introduce his evidence arrives, and the paper cannot ordinarily be introduced in evidence as part of the cross-examination." (40 Cyc. 2746.)

The court might within its discretion have permitted its in-troduction at this time. (*Chicago City R. Co. v. Matthieson,*

Cole v. Drum.

113 Ill. App. 246.)   Still it was not error to sustain the objection, for the plaintiff still had a right to offer the paper in evidence, if otherwise proper, as a part of his case in rebuttal.

Another witness was asked whether at a certain time the testator could talk connectedly. This was objected to as incompetent, irrelevant, immaterial, leading and suggestive, and the objection was sustained. On motion for new trial the affidavit of this witness was introduced to the effect that if he had been permitted to testify he would have said the testator could not talk connectedly. A similar question covered by similar affidavit by another witness was objected to and the objection sustained. Still another witness, a doctor, was asked whether a request to be given an overdose of morphine and the fact that he tried to take or talked of taking his life, would indicate anything concerning the mental condition of the testator. Objections to these questions were sustained, and the doctor's affidavit on motion for rehearing was to the effect that he would have testified that such talk indicated insanity and was one of the leading indications thereof.

One of the other witnesses referred to had already testified that he did not think the testator talked connectedly, and immediately thereafter he was asked whether or not he did talk connectedly and whether he jumped from one subject to another, or whether he showed he could talk connectedly or not. These questions were objected to as leading and calling for the opinion of the witness, and were ruled out. He was then asked if from various talks and from his appearance and what he said he considered him of sound mind, and his answer was: "My opinion is that Mr. Cole was insane." Having, therefore, accomplished the purpose sought by showing the conclusion of the witness, the exclusion of certain things leading up to such conclusion was not material error. The same thing is true of the other witness referred to, and as to the doctor, it may be observed that he was permitted to testify he thought the testator was of unsound mind, and that he came to this conclusion from an examination he made of him, his observations and conversations had with him. It seems hardly necessary to suggest that, in view of this testimony, the mere fact that he was not permitted to state his view of the testator's tendency to suicide cannot have worked any substantial prejudice.

It is next contended that error was committed in permitting the attorney who drew the will to state whether or not, in his opinion, the testator had sufficient capacity at the time to make a valid will. *Gordon v. Gordon,* 92 Kan. 730, 142 Pac. 242, is cited in support of this complaint. This witness testified that he had been probate judge and had had experience in the trial of cases of insanity, was an old soldier and well acquainted with the testator and knew him forty-four years and was sent for to make his will, and he told what had occurred at that time. What was said in *Gordon v. Gordon,* may well be repeated:

"The questions were objected to because they embrace the ultimate fact in issue. It must be remembered that these witnesses testified to the incidents, circumstances, conduct and appearances, upon which their opinions were based, and that there was ample competent evidence to support the finding without this testimony of these particular witnesses." (p. 731.)

Following the words just quoted, the court further said:

"Conceding that the questions were objectionable, the error was harmless . . . It will be presumed that the finding was made upon competent evidence and that the court was not influenced by the opinions of witnesses in fixing the standard of testamentary capacity." (p. 731.)

Counsel were correct in their suggestion that the ultimate fact of mental capacity is for the jury and not for the witnesses. (*Coblentz v. Putifer,* 87 Kan. 719, 125 Pac. 30; *Brown v. Brown,* 96 Kan. 510, 152 Pac. 646, and *Hessen v. Sapp,* 98 Kan. 737, 160 Pac. 220.) In the last case it was said:

"The statements of the nonexpert witnesses that they regarded Culbertson as incapable of transacting important business seems unlikely to have influenced the jury's conception of what impairment of his faculties was necessary to render the deed inoperative. Moreover the jury were acting only in an advisory capacity. The decision finally reached was that of the judge, and there is no likelihood that he was in any way misled by the form in which any of the evidence referred to was presented." (p. 739.)

Here, also, the jury had acted in an advisory capacity, but their advice had been rejected by the court, and the findings of fact and conclusions of law were arrived at from its own consideration of the voluminous evidence. It is a familiar and well-settled rule that in a case tried by the court it is to be presumed that only competent and proper testimony influenced the decision.

Cole v. Drum.

The argument is made that the plaintiff was entitled to a jury as a matter of right, and counsel cite the statute prescribing the mode of contesting a will to be a civil action in the district court. (Laws 1917, ch. 336, § 2.) Section 5 of the bill of rights has been held to cover only matters triable by jury at common law. (*Kimball and others v. Connor, Starks and others,* 3 Kan. 414.) The legislature has provided that issues of fact in actions for the recovery of money or of specific real or personal property shall be tried by a jury, unless a jury trial is waived. (Gen. Stat. 1915, § 7179.) Various other issues have been held triable without a jury. (*McCardell v. McNay,* 17 Kan. 433; *Houston v. Comm'rs of Cloud Co.,* 19 Kan. 396; *Sword v. Allen,* 25 Kan. 67; *Morgan v. Field,* 35 Kan. 162, 10 Pac. 448; *Culp v. Mulvane,* 66 Kan. 143, 71 Pac. 273; *Hockett, v. Earl,* 89 Kan. 733, 133 Pac. 852; *Akins v. Holmes,* 89 Kan. 812, 133 Pac. 849; *Houston v. Goemann,* 99 Kan. 438, 162 Pac. 985, 176 Pac. 147; *Postlethwaite v. Edson,* 106 Kan. 354, 187 Pac. 688; *Lockmann v. Caruthers,* 108 Kan. 81, 193 Pac. 890.)

In *Rich v. Bowker,* 25 Kan. 7, it was held that in an action to contest a will the parties are not as a matter of right entitled to a jury. Horton, C. J., said the action did not come within any of the terms of the statute; that it was a statutory proceeding and in such actions the legislature is fully competent to dispense with the jury. In *Lewis v. Snyder,* 72 Kan. 671, 83 Pac. 621, the jury found the testator of sound mind, but the court considered the testimony and later found "without regard to the verdict and answer of the jury" that he was of sound mind, and it was held in this situation the instructions given the jury became immaterial.

Counsel refer to a statement in the opinion in *Wright v. Young,* 75 Kan. 287, 291, 89 Pac. 694, that in an action to contest a will either party may demand a jury. The subject there under discussion was the probate of a will, the matter having been appealed to the district court. It was said that the single question presented was whether the district court erred in holding that the statute (Laws 1905, ch. 526) did not enlarge the issues upon an application for the probate of a will. The question on appeal was simply whether or not the will should be admitted to probate. It was in regard to the contest of a will, and not its probate, that the words referred to were used, and

later in the opinion the court adverted to the probability that "either party will desire submitted to a jury" the matters involved. (p. 294.) The sentence relied on, therefore, should be considered a mere inadvertence. Within the decisions from the 3d Kansas to the 98th Kansas neither party had any right, constitutional or otherwise, to a jury in this case.

The testimony, as usual in such cases, was conflicting. Two large groups of witnesses told of the life, looks, actions and talk of John N. Cole, and gave their opinions as to his soundness of mind. The court heard them all and was satisfied that the testator knew what he was doing and why, when he made the will. The record abundantly bears out the conclusions reached. It is not necessary to recite the stories told by various neighbors and acquaintances further than as they appear in the findings of the court hereinafter set forth.

The will was in the following words and figures:

"LAST WILL AND TESTAMENT.

"I, John N. Cole, of Bourbon County, Kansas, being of sound mind and memory, do make, publish and declare this to be my last will and testament.

"1. I do make, constitute and appoint my good friend, Henry Drum, of Bourbon County, Kansas, executor of this my last will and testament.

"2. I direct that immediately after my death the Konantz Undertaking Company, of Fort Scott, Kansas, be placed in charge of my remains with full power and instruction to provide a proper funeral for my body, and I direct said undertaking company to bury me in a casket similar to the one used for the burial of my beloved wife, now deceased, and I direct my executor to provide a tombstone for my grave similar to the one which marks the resting place of my wife.

"3. I give and bequeath to my beloved sister, Sarah Reed, the sum of five hundred dollars to be paid to her by my executor in annual installments of fifty dollars each, commencing three months after my death; and should my said sister depart this life at any time within said ten years' period, the balance of said five hundred dollars then unpaid, but not in excess of one hundred dollars, shall be used by my executor in payment on the funeral expenses of my said sister; and should the balance of said five hundred dollars bequeathed unpaid at the time of her death exceed one hundred dollars then the excess over the one hundred dollars to be used for her funeral expenses shall go back and become a part of my general estate.

"4. I give, and bequeath unto the Maple Grove Cemetery Association of Bourbon County, Kansas, the sum of five hundred dollars to be paid to it by my executor upon condition that the members of the association shall subscribe and contribute a like amount of five hundred dollars to be used by the board of trustees in maintenance and beautifying the ceme-

tery grounds and in case the members of the association fail to subscribe and contribute the sum of five hundred dollars to equal my bequest, then the bequest shall become inoperative and shall go back and become a part of my general estate.

"5. I give and devise unto my beloved son, Charles N. Cole, all of my real estate wherever situated, of which I may be seized or possessed, to have and to hold during his natural life; and at the death of his wife, Bertha Cole, leaving the said Charles N. Cole, surviving her, to be his in fee simple absolute; but, with remainder over at the death of the Charles N. Cole, leaving Bertha Cole, his wife, surviving him, unto the Della G. Strong Home and Hospital of Fort Scott, Kansas, The Holiness Industrial Children's Home of Fort Scott, Kansas, and the Goodlander Home, of Fort Scott, Kansas, in equal parts, or to such of said institutions as may at the time of the death of the said Charles N. Cole be in existence and capable of receiving this devise; and should all of said institutions be out of existence at the time of vesting, or incapable of receiving this devise, then remaining over in fee simple at the time of the death of my son, Charles N. Cole, leaving Bertha Cole surviving him, unto Henry Drum and George Alford as trustees for the use and benefit of such charitable institutions or institutions of the city of Fort Scott, Kansas, as may seem to the trustees deserving; with full power in said trustees to sell said land after the death of the said Charles N. Cole, leaving Bertha Cole surviving him, and to use the proceeds of said sale in the assistance of such charitable institutions as above described at such times and in such ways as may seem most practicable with full power in said trustees to invest the proceeds of the sale of said lands until such time as they may deem the principal necessary for the use of the institutions which they may select as the object of my bounty.

"In case there is no charitable institutions in existence in Fort Scott competent in law to receive the benefit of this will at such time as the property may vest at the death of Charles N. Cole under the contingency mentioned then I direct the trustees under this will to use this funds for the benefit of needy and helpless children and aged persons in Bourbon county and that said trustees report proceedings to the district court of said county annually and as often as ordered by said court.

"6. I give and bequeath to Bertha Cole, wife of my beloved son Charles N. Cole, the sum of one dollar.

"7. I give and bequeath to my beloved son, Charles N. Cole all my personal property of every kind to be his absolutely, after the payment of the specific bequests hereinbefore enumerated.

"In witness whereof, I have hereunto set my hand this 21st day of June, 1918.                                JOHN N. COLE."

The principal findings of fact made by the court were the following:

"1. That John N. Cole was born in West Virginia in 1842, was a soldier in the Civil War, and came to Bourbon County, Kansas soon after the close of the war; that he married in Bourbon County, Kansas,

and spent the remainder of his life in that county, and died on August 24th, 1918.

"2. That John N. Cole was a farmer and stockman and in this occupation had acquired, and owned, at the time of his death, 680 acres of land, less railroad right of way, and in addition thereto, had acquired and given to his son, Charles N. Cole, who is the plaintiff in this action, 160 acres of land and some personal property.

"3. That the plaintiff, Charles N. Cole, at the time of the trial, was 44 years old and he lived with his father, John N. Cole, for 33 years, at which time he married the defendant, Bertha Cole, and had been married to said Bertha Cole for about eleven years at the time of the making of the will in controversy, and that no children have ever been born to Charles N. Cole and Bertha Cole.

"4. That the wife of John N. Cole died on about July 6, 1916, and that John N. Cole, a short time after the death and burial of his wife, stated to at least two persons, that Bertha Cole had sneered at Charles N. Cole when he displayed some grief at the death of his mother.

"5. That on about February 22, 1917, John N. Cole suffered a stroke of paralysis while in West Virginia on a visit, resulting in paralysis of the left arm and left leg and affecting the right eye and right half of the face.

"6. That from on about February 22, 1917, until the death of John N. Cole, he continued to suffer the effects of the stroke of paralysis.

"13. That during the period from the 9th of November, 1915, until about February 28, 1916, Rachel Cole, the wife of John N. Cole, was so ill that a nurse was in attendance upon her and during that period, Bertha Cole, came only upon one occasion to see her mother-in-law, Rachel Cole, although Bertha Cole was at the time living only about a half a mile from the house of the said John N. Cole.

"14. That on account of the conduct of Bertha Cole exhibited toward his wife and himself, John N. Cole, had formed, before the stroke of paralysis, a dislike for Bertha Cole and before and after the stroke of paralysis, frequently had expressed his intention to bar her by will from any expectancy in his property.

"15. That the stroke of paralysis which John N. Cole suffered on or about February 22, 1917, affected his motor centers and affected the nerve which controlled the movements of his left arm and left leg and affected the appearance of his eyes and affected his speech, so that he did not talk as plainly as he did before he was paralyzed, and that after said stroke of paralysis, John N. Cole was unable to move about without assistance and would cry frequently, while conversing with friends and acquaintances.

"16. That after the return of John N. Cole from the Soldiers Home at Leavenworth, Kansas, the said John N. Cole dictated numerous letters to Bertha N. Bollinger, which she wrote at his dictation, to friends and kinfolks, and some of which were introduced in evidence at the trial of the case; and that thereafter and up to within ten days or two weeks of the time of his death, the said John N. Cole, himself, wrote in his own

Cole v. Drum.

hand, numerous letters and communications to various friends and kin-folks, many of which were introduced in evidence, and all of which are rational and connected in thought and expression.

"17. That on June 18, 1918, three days prior to the making of the will in controversy, the said John N. Cole wrote a letter to the daughter of the man who raised him back in West Virginia, which letter was produced in evidence, and which is a letter entirely rational and con-nected in its expression.

"18. That in the evenings from about May 15, 1917, until within ten days or two weeks of the time of the death of John N. Cole on or about August 24, 1918, Bertha N. Bollinger spent the evenings in the company of John N. Cole and read to him books, upon the contents of which, the said John N. Cole commented as the reading continued; and that the said John N. Cole listened to the playing of a graphaphone and particularly expressed satisfaction with one selection, 'Beautiful Isle of Somewhere,' which he requested be sung at his funeral.

"19. The court finds that on the 14th day of May, 1917, said John N. Cole signed a will prepared by Mr. A. M. Keene, an attorney of Fort Scott, Kansas, leaving all of his property to his son, Charles N. Cole, with the exception of a bequest of $250.00 to his sister, Sarah Reed of Reedsville, West Virginia, but that in September,.1917, said John N. Cole destroyed said will by cutting his name off of said will.

"20. That at the August primary election in 1918, prior to the death of John N. Cole, he went to the polls, chose a Republican ballot, which had been his politics, and had the judges mark his ballot for him; and that he told the judges the names of the various candidates for whom he wished to vote without any suggestion from them in reference thereto.

"21. That up to within ten days or two weeks prior to the death of John N. Cole he read the newspapers, the Fort Scott *Tribune*, the Kansas City *Journal*, and sometimes the Kansas City *Post*; and that he followed the market reports and the progress of the world war, and discussed in-telligently with those around him, the matters which he had read in the papers and other matters which arose.

"22. That on June 13, 1918, John N. Cole wrote in his own hand-writing a letter and addressed the envelope to Ben Hudson, the familiar name by which B. Hudson, a practicing lawyer of Fort Scott, Kansas, is known, a copy of which is here set out:

'*Mr. B. Hudson,*                              'FORT SCOTT, KANS., June 13.

'DEAR SIR: I am about wind up & I want some one to help me give the last turn, that is I want to write a will. that is where I want the help. Can you come out & help me, if you can come send me a card & say what day you can come.          Yours truly,          J. N. COLE.'

"23. That on or about June 17 or 18, 1918, B. Hudson with his son, Douglas Hudson, in response to said letter, went to the farm of John N. Cole, and B. Hudson, who had been a friend and acquaintance of the testator for many years, having been thrown together in the G. A. R. Post at Fort Scott in the years gone by, at said time received instruc-tions from John N. Cole as to how he wished his will to be drawn; that the will as finally signed by John N. Cole on June 21, 1918, was in ac-

cordance with the wishes and desires expressed by John N. Cole on or about June 17th or 18th, 1918; and that the said B. Hudson made practically no suggestion to the said John N. Cole with reference to the manner in which said will should be drawn.

"24. That the will in controversy was drawn at the office of Hudson & Hudson, attorneys in Fort Scott, Kansas, on or about June 18th or 19th, 1918, by Douglas Hudson and B. Hudson, with the exception of the names of Sarah Reed, a sister of John N. Cole, who was remembered in the will, Bertha Cole, the daughter-in-law, and Henry Drum and George H. Alford, trustees, the names of which four persons were inserted in the will by Douglas Hudson prior to its signing by John N. Cole on June 21, 1918, at the instruction of John N. Cole and in the presence of the four witnesses to the will.

"25. That on the afternoon of June 21, 1918, George H. Alford, Fred Roy Alford, B. Hudson and Douglas Hudson went to the home of John N. Cole and after the names had been called as called and expressed by John N. Cole, the will was read over to John N. Cole by B. Hudson in the presence of the five persons whose signatures appear upon the will, and he assented and expressed himself that such instrument was his will, and signed his name thereto upon the margin of the first page thereof and subscribed his name to the will upon the second and final page thereof; and all of said four persons above named, then signed as witnesses to the execution and signing of said will; and that each of said witnesses and said testator signed the same in the presence of each other.

"26. That it had been suggested by John N. Cole upon the previous visit of B. Hudson that the daughter-in-law, Bertha Cole, would try to break the will and prove that he was crazy, and that the said John N. Cole on that day and on the 21st day of June, 1918, the day the said will was signed, named seven witnesses, including two doctors, Drs. Payne and Thomas, by whom his sanity could be proved in case of contest.

"27. That the said B. Hudson, Douglas Hudson, George H. Alford and Fred Roy Alford remained with the testator for about forty-five minutes at the time of the signing of said will, and that his conversation at said time was rational and connected, and part of the same was preserved in shorthand by Douglas Hudson and read at the trial of this case.

"28. The court finds that on the 29th day of August, 1918, said alleged will was presented to the Probate Court of Bourbon County, Kansas, for probate, and that on about the 31st day of August, 1918, it was admitted to probate by the Probate Court of Bourbon County, Kansas.

"29. That the jury called in this action to act in an advisory way, found that John N. Cole was not of sound mind and memory on the 21st day of June, 1918, the date of the execution of said will, but the answer returned by the jury to the question propounded to it, is unsatisfactory to the court and does not meet with its approval. It is the court's opinion that the finding of the jury is against the weight of the evidence and should be set aside. Therefore, the court does not adopt the advice given by the jury but makes its own findings from the evidence.

"30. That on June 17th or 18th, 1918, when the terms of the will in question were dictated by John N. Cole to B. Hudson, attorney, and on the 21st day of June, 1918, at the time of the execution of the said will, John N. Cole, although suffering physically from paralysis or hemiplegia, had full knowledge of the act that he was engaged in and of the property that he possessed and an intelligent understanding of the disposition he desired to make of it and the persons he desired should receive his property and the capacity to recollect and apprehend the nature of the claims of those who were excluded from participating in his bounty and that at the time said will was dictated, made and signed, the said John N. Cole was of 'sound mind and memory' and possessed testamentary capacity and was capable of making a valid disposition by will, of his property."

The rule is well established in this state that one who is able to understand what property he has, and how he wants it to go at his death, is competent to make a will even though he may be feeble in mind and decrepit in body. The value of property consists largely in the right to dispose of it as the owner desires, and this power of disposal, either by deed or by will, is not to be interfered with so long as the mental capacity indicated remains. This rule is found clearly set forth in numerous decisions of ours, three of which may be referred to as recent expressions: *Coblentz v. Putifer*, 87 Kan. 719, 125 Pac. 30; *Wisner v. Chandler*, 95 Kan. 36, 66, 147 Pac. 849, and *Nordman v. Nordmark*, 100 Kan. 522, 164 Pac. 1062.

The record brings this case fully within this rule and the decree is affirmed.